DISTRICT COURT OF THE UNITED STATES
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:13CV571-RJC
(3:09CR189-RJC-DCK-3)

| | | |
|---|---|---|
| MARVIN SUNTATE MOBLEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), on the Government's Response in

Opposition to Petitioner's Motion to Vacate, (Doc. No. 15), and on Petitioner's Reply, (Doc. No.

21).

I.      **BACKGROUND**

A.  **Indictment and Pre-Trial Background**

On October 20, 2009, the Grand Jury for the Western District of North Carolina indicted

Petitioner Marvin Suntate Mobley and his father, Silas Junior Mobley, on two drug trafficking

counts.  (Crim. Case No. 3:09-cr-189-RJC-DCK-3, Doc. No. 1: Indictment).  Count One charged

both Mobleys with conspiring with one another, with Jeremy Williams, and with others known

and unknown to the Grand Jury, from early 2004 to the issuance of the indictment, to distribute

cocaine and to possess cocaine with intent to distribute, said offense involving 5 kilograms or

more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); and Count Three charged

both Mobleys with the attempted possession of 500 grams or more of cocaine on June 1, 2009, in

violation of 21 U.S.C. §§ 846 and 841(b)(1)(B), and aiding and abetting the same, in violation of 18 U.S.C. § 2. (Id.). On December 9, 2009, attorney Harold Bender was appointed to represent Petitioner. (Id., Doc. Entry dated 12/9/2009). Counsel Bender represented Petitioner until the Court granted his motion to withdraw as counsel on April 9, 2010. (Id., Doc. No. 45). On April 12, 2010, attorney Richard Brown was appointed to represent Petitioner. (Id., Doc. No. 46). On July 26, 2010, Brown filed a motion to withdraw as counsel. (Id., Doc. No. 67). On July 28, 2010, the Court denied Brown's motion to withdraw as counsel. (Id., Doc. No. 70).

**B. Petitioner's Trial**

**1. Background**

Following two continuances by the Court, Petitioner's jury trial began on August 6, 2010. See (Id., Doc. Nos. 39; 56). The day before the trial started, the Government filed a notice, pursuant to 21 U.S.C. § 851, informing the Court of Petitioner's prior federal felony conviction of conspiracy to distribute and possess with intent to distribute cocaine and his multiple prior South Carolina felony drug convictions, including convictions for possession of crack cocaine, manufacture and distribution of crack cocaine near a school, possession of crack cocaine and marijuana, and possession of marijuana.[1] (Id., Doc. No. 83: Section 851 Notice).

At trial, the Government presented direct evidence of Petitioner's participation in the charged offenses through (1) testimony and corroborating wiretap conversations relating to the years-long conspiracy among Silas Mobley, Petitioner, and others to distribute multiple kilograms of cocaine and to possess multiple kilograms with the intent to distribute; and (2) a final attempt by the Mobleys to acquire another kilogram of cocaine from one of their co-conspirators, unaware

---

[1] The Government also filed prior Section 851 Notices on December 9, 2009, March 16, 2010, and July 25, 2010. (Id., Doc. Nos. 14; 34; 36; and 65).

that he had just begun to cooperate with law enforcement.  In that final overt act, the Mobleys

brought the cash amounting to the pre-arranged purchase price, $30,500, but the cooperator told

them that the deal could not be completed that day.  (Id., Doc. No. 104 at ¶¶ 9; 10: PSR).  As the

Mobleys drove away, law enforcement officers performed a traffic stop and, in a subsequent

search of their vehicle, recovered $30,500.  (Id. at ¶ 10).

### 2. Evidence of the Conspiracy Presented at Trial

Kenneth Patterson testified that he had conspired with Silas Mobley, Petitioner, and

others to traffic in drugs.  (Id., Doc. No. 150 at 214-15).  His first transaction with Silas Mobley

was in 2002 or 2003, when Silas Mobley supplied him with a kilogram of cocaine.  (Id. at 215-

16).  The next deal with Silas Mobley involved Patterson's purchase from him of two more

kilograms of cocaine.  (Id. at 216).  In total, Patterson testified that he had engaged in at least 50

cocaine deals with Silas Mobley, in quantities varying from kilograms down to half-ounces.  (Id.

at 217).  Patterson also engaged in five or six cocaine deals with Petitioner, always in kilogram

quantities.  (Id. at 217-18).  Patterson shifted from doing the deals with Silas Mobley to doing

them with Petitioner because of an incident in which Silas had shorted him $1,000 for a kilogram

of cocaine.  (Id. at 224-25).  Patterson's testimony was corroborated by wiretap recordings of

four conversations he had with Silas Mobley in late February and early March 2009 in which

they discussed their cocaine trafficking activity, including the problem of the recent $1,000

shortfall.  (Id. at 110-12).  Another co-conspirator, Darryl Harrison, first served as a middleman

for Silas Mobley to purchase a kilogram of cocaine from a Hispanic male, known to Harrison as

"Moses," in late April 2009.  (Id. at 142-43).  Silas Mobley told Harrison that he (Mobley) would

have to get part of the purchase money from his partner.  (Id. at 145).  During that deal, Harrison

acted as the go-between, taking the cocaine from Moses' vehicle to Mobley's vehicle, a white

GMC.  (Id. at 144).  Mobley reached behind the seat and grabbed a bag of money that he handed to Harrison, who walked it back to Moses.  (Id. at 142-43).  The bag held either $30,500 or $31,000, of which Harrison got $500 for his services.  (Id. at 143).

A few days later, in early May 2009, Silas Mobley called Harrison and told him he wanted to buy another kilogram of cocaine and 20 pounds of marijuana, and Harrison arranged for the deal to happen at his own residence.  (Id. at 146-47).  The cocaine cost $31,000 and the marijuana cost $14,000.  (Id. at 147).  Moses and another Hispanic male, whom Harrison only knew as "The Boss," met at Harrison's place with both Silas Mobley and Petitioner.  (Id.).  Moses displayed the cocaine, which Petitioner examined and verified.  (Id. at 148).  Petitioner discussed the possibility of a later multi-kilogram cocaine purchase, saying that the single-kilogram price was a little high, based on his knowledge, and he asked if Moses could give him a better price for a three-kilogram deal.  (Id. at 148-49).  Moses said they could work something out, and Mobley should let him know when he was ready to do that.  (Id.).  Meanwhile, Silas Mobley took one of the pounds of marijuana, left the residence briefly, and returned, saying the marijuana was okay.  (Id. at 150).  All the drugs were then put into a box and loaded into an SUV.  (Id.).

In their next deal, Harrison arranged for a meeting among Silas Mobley, Moses, and himself at a shopping center parking lot, where Harrison again acted as the go-between, carrying a kilogram of cocaine from Moses to Silas, and the cash from Silas to Moses.  (Id. at 151).  Petitioner was not present for that deal.  (Id.).  On May 28, 2009, Harrison and Silas Mobley arranged for the purchase of another kilogram of cocaine, and Moses and The Boss arrived at Harrison's apartment with that kilogram as well as five more kilograms intended for another purchaser.  (Id. at 152).  That other purchaser obtained his cocaine, but Harrison was unable to

reach Silas Mobley while the suppliers were there. (Id. at 153). Later that day, however, Immigration and Customs Enforcement (ICE) Special Agent James Bryant and other agents detained Harrison at his apartment, and Harrison agreed to cooperate. (Id. at 154-55).

Agent Bryant testified that his office had received a telephone call on May 28, 2009, from ICE's Charleston, South Carolina, office, leading them to conduct surveillance at an apartment where several Hispanic males were residing, as well as at Harrison's apartment complex, where multiple kilograms of cocaine were supposed to be delivered. (Id. at 36-38). They observed several people going in and out of the complex and then, as a result of further information received from the Charleston office, they arrested seven people, including Moses Valencia, and seized approximately 15 kilograms of cocaine from a car. (Id.). The Hispanics whom they arrested cooperated immediately against Harrison, prompting Agent Bryant to go to Harrison's apartment to detain him and to seek his cooperation that day. (Id. at 42-43). Harrison agreed to cooperate, and told the agent that Moses and The Boss had brought six kilograms of cocaine to his apartment that day, five for Jeremy Williams and one for Silas Mobley and Petitioner. (Id. at 152-53).

While the agent and Harrison were speaking at Harrison's apartment, Silas Mobley called about the kilogram of cocaine, but said that he wanted to get together later because of the rainy weather. (Id. at 156). Harrison called him back to make arrangements for a later date for the deal. (Id.). Eventually, Harrison and Mobley agreed, in another telephone conversation, to meet at a restaurant parking lot in Charlotte on June 1, 2009. (Id. at 158-59). The recordings of those conversations were played for the jury. Agent Bryant also identified the telephone number used by Silas Mobley in these conversations with Harrison as being the same number used by Silas Mobley in his wiretapped conversations with Patterson in late February and early March 2009.

(Id. at 137).

### 3. The June 1, 2009, Seizure of $30,500

On June 1, 2009, Agent Bryant participated in the surveillance of Harrison's pre-arranged meeting with Silas Mobley and Petitioner at a Charlotte Burger King parking lot, as they attempted to purchase the kilogram of cocaine. (Id. at 48). As ICE had told him to do, Harrison delayed the deal by telling the Mobleys that he was waiting on Moses and The Boss to arrive with the cocaine. (Id.). In actuality, however, there would be no cocaine arriving that day, and the agents hoped to observe a traffic violation so that they could perform a traffic stop on the Mobleys' vehicle and positively identify them. Officer Chris Newman, a canine officer with the Charlotte-Mecklenburg Police Department testified that, at the direction of Agent Bryant, he and his partner Officer Raby participated in the traffic stop, based on an expired tag, of a white SUV that had been heading south on I-77 in Charlotte. (Id. at 97-102). Silas Mobley was driving the SUV and Petitioner was in the front passenger seat. (Id. at 102-03).

While Officer Raby was running the Mobleys' information, Officer Newman walked his drug-sniffing police dog around the outside of the SUV, and the dog positively alerted to the back doors on both sides of the vehicle. (Id. at 103-04). Officer Newman asked Petitioner if there was anything illegal in the vehicle. Petitioner appeared to be searching for an answer before he eventually said that there was $30,000 in the car. (Id. at 104-05). Officer Newman retrieved a plastic bag from under the back seat on the driver's side. (Id. at 105-06). The officer immediately noticed that the bag had the strong odor of cocaine about it, so he put it to his face and smelled, then looked to Officer Raby and asked him to smell it. (Id. at 106-07). Petitioner, seeing this, said words to the effect of: "That don't mean nothing. There's nothing wrong." (Id. at 107). The drug dog alerted on the cash after Officer Newman laid it out on the hood of the

patrol car.  (Id.).  All the cash, totaling $30,500, was in bundles: thirty bundles of $1,000 and one

bundle of $500.  (Id.).  Officer Newman had seen this method of bundling previously, associated

with the drug trade.  (Id. at 108).  Agent Bryant, too, described this method of bundling cash as

being common among drug dealers.  (Id. at 31).

### C.  Presentence Report and Sentencing

The trial concluded on August 9, 2010, with the jury convicting Petitioner on both counts as

alleged in the indictment.  (Id., Doc. No. 93: Jury Verdict).  The probation office thereafter

submitted a Presentence Report ("PSR") in preparation for Petitioner's sentencing hearing.  In

the PSR, the probation officer determined that the base offense level was 34, based on

Petitioner's being responsible for 29 kilograms of powder cocaine and 5800 kilograms of

marijuana.  (Id., Doc. No. 104 at 6-7: PSR).  The probation office cited Petitioner's 1997 South

Carolina York County conviction and a 2004 federal conviction for conspiracy to possess

cocaine with the intent to distribute, among others, in calculating a criminal history score of IV,

yielding an advisory range of 210 to 262 months.  (Id. at 8; 10; 14).  Because of Petitioner's two

prior felony drug convictions, however, the mandatory minimum for Count One (the conspiracy

involving 5 or more kilograms of cocaine) was life, and the statutory range for Count Three

(involving the attempted possession of 500 grams or more of cocaine with the intent to

distribute) was 10 years to life.  (Id. at 14).

Petitioner objected that the § 851 notice did not contain two qualifying convictions that

would trigger a mandatory life sentence for Count One, although he did not specify in what way

the notice or the convictions were inadequate.  (Id., Doc. No. 112: Objection).  The Probation

Office disagreed with the objection.  (Id., Doc. No. 114 at 17: Final PSR).  At the sentencing

hearing, Petitioner's trial counsel, Richard Brown, renewed the objection, specifying that the

1997 York County conviction had resulted in a sentence under South Carolina's Youthful

Offender Act, that Petitioner had not been subject to imprisonment for a term exceeding one

year, and therefore as a result of <u>Carachuri-Rosendo v. Holder</u>, 130 S. Ct. 2577 (2010), that prior

conviction was not a "felony" as to Petitioner.  (<u>Id.</u>, Doc. No. at 157 at 6-7: Sentencing Tr.).  The

prosecutor responded that he had not been prepared to address this issue due to a lack of notice

that this was the basis for the objection, but that his previous research had indicated that

convictions under the Youthful Offender Act qualified as prior felony drug convictions.  (<u>Id.</u> at

8; 9).  The Court overruled the objection, finding that the offense was punishable by up to six

years, that Petitioner had received a sentence of imprisonment up to five years, and that this met

the statutory definition of a felony drug conviction.  (<u>Id.</u> at 9-10).  The Court imposed a sentence

of life imprisonment on Count One, and 10 years on Count Three, to be served concurrently.

(<u>Id.</u>, Doc. No. 158: Judgment).

### D.  Appeal and Pending Motion to Vacate

Petitioner appealed, arguing that the Court improperly denied his motion for new counsel,

filed shortly before trial was scheduled to commence; that the Court plainly erred in its

instructions to the jury as to its responsibility to find the drug quantity reasonably foreseeable to

each defendant; and that Petitioner's prior conviction under South Carolina's Youthful Offender

Act did not qualify as a felony drug offense sufficient to support a sentence enhancement under

21 U.S.C. §§ 841(b)(1) and 851.  The Fourth Circuit affirmed this Court's judgment on May 14,

2012, finding that this Court properly determined that the 1997 conviction was a predicate felony

drug offense under § 841(b)(1).  <u>See</u> <u>United States v. Mobley</u>, 482 F. App'x 766 (4th Cir. 2012).

Petitioner filed a petition for writ of certiorari, which petition was denied by the Supreme Court

on October 9, 2012.  <u>Mobley v. United States</u>, 133 S. Ct. 464 (2012).

Petitioner placed the instant motion to vacate in the prison mailing system on October 8, 2013, and it was stamp-filed in this Court on October 10, 2013. On May 21, 2014, the Government filed a Response to the motion to vacate, and on October 21, 2014, Petitioner filed a Reply. (Doc. Nos. 15; 21). Petitioner brings the following claims of ineffective assistance of counsel in the petition: (1) counsel was ineffective for failing to advise Petitioner that he would face a mandatory life sentence if Petitioner were found guilty at trial; (2) counsel was ineffective for failing to conduct an adequate investigation; (3) counsel was ineffective for failing to object to prosecutorial misconduct; (4) counsel was ineffective for stipulating to one of Petitioner's prior drug convictions; (5) Petitioner's first counsel Harold Bender denied Petitioner his right to a speedy trial under the Speedy Trial Act; (6) counsel was ineffective for failing to move to sever the trial from Petitioner's co-Defendant Silas Mobley; (7) appellate counsel was ineffective for failing to present stronger arguments on appeal; and (8) Petitioner's Sixth Amendment rights were violated under <u>Alleyne v. United States</u>, 133 S. Ct. 2151 (2013).

In support of his allegations, Petitioner has submitted an affidavit by Petitioner's mother Marjorie Mobley, in which Marjorie Mobley attests that Petitioner's trial counsel Richard Brown assured her before trial that Petitioner's prior convictions would not subject him to a life sentence. (Doc. No. 4). Petitioner has also submitted an affidavit by Courtney Blake, who is the mother of Petitioner's three children, in which Blake asserts that, on some unspecified date in 2010, Mr. Brown told her in the presence of Marjorie Mobley that, if found guilty at trial, Petitioner would be facing a minimum of 20 years, but not a mandatory life sentence. (Doc. No. 5 at ¶ 4: Courtney Blake Aff.). Blake also asserts in the affidavit that when agents visited her father's home after Petitioner's arrest they intimated and threatened Blake's family members and told Blake's father it would not be good for Blake to testify at Petitioner's trial. (<u>Id.</u> at ¶ 14).

The Government requested and obtained an affidavit responsive to those claims from Petitioner's trial counsel Richard Brown. (Doc. No. 15-1). Additionally, because of the allegations of police misconduct asserted by Blake in her affidavit, ICE Special Agent James Bryant has also provided the Government with an affidavit responsive to those allegations. (Doc. No. 15-2).

## II.     STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.     DISCUSSION

### A.  Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell,

506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

The Strickland framework applies to claims of ineffective assistance in the plea bargaining process. See Lafler v. Cooper, 132 S. Ct. 1376 (2012); Missouri v. Frye, 132 S. Ct. 1399 (2012). In Lafler, the Supreme Court held that "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." 132 S. Ct. at 1387. The Court further stated that the petitioner

> must show that but for the ineffective advice of counsel there is a reasonable
> probability that the plea offer would have been presented to the court (i.e., that the
> defendant would have accepted the plea and the prosecution would not have
> withdrawn it in light of intervening circumstances), that the court would have
> accepted its terms, and that the conviction or sentence, or both, under the offer's
> terms would have been less severe than under the judgment and sentence that in
> fact were imposed.

Id. at 1385.

**1. Counsel's Failure to Advise Petitioner that He Would Face a Mandatory Life Sentence if Convicted at Trial**

In his first ground for relief, Petitioner contends that trial counsel Richard Brown was ineffective because counsel advised Petitioner that, if convicted at trial, Petitioner would not receive a mandatory life sentence because his prior conviction under South Carolina's Youthful Offender Act could not be counted as a "felony drug offense" sufficient to support an enhanced sentence. As noted, Petitioner supports this assertion with affidavits from both the mother of three of his children and his own mother, both of whom state that Brown told them that, even if

convicted at trial, Petitioner would not face a mandatory life sentence.  See (Doc. No. 5 at ¶¶ 4;

6-7: Courtney K. Blake Aff.; Doc. No. 4 at ¶¶ 3-4: Marjorie Mobley Aff.).  Petitioner further

contends that, on some unspecified date, counsel Brown:

> assured me that if I were convicted that my prior 1997 drug conviction could not
> be used to enhance my sentence in the event I was convicted . . . .  Mr. Brown
> informed that the sentence of probation that had been imposed on April 24, 1997,
> under South Carolina's Youthful Offender Act, could not be used under 851 and
> could not be counted as a prior "felony drug offense" to enhance my sentence to a
> mandatory life sentence.  He said that the prior conviction in Criminal Case No.
> 6:03-cr-237, which was a cocaine conspiracy conviction, was the only prior
> conviction that could legally be used by [the Court] to impose an enhanced
> sentence.  Mr. Brown told me that I could exercise my right to a jury trial without
> having to worry about a mandatory life sentence as a consequence if I were
> convicted.

(Id. at 29-30).  Plaintiff asserts that "a plea offer of 20 years was rejected after counsel

misadvised [Petitioner] that a 'mandatory' life sentence was not statutorily possible because the

1997 South Carolina [Youth Offender Act] conviction and sentence could not be used."  (Id. at

6).  Petitioner further notes that at his sentencing hearing, Mr. Brown stated to the Court that he

had talked to Petitioner "about the Youth Offender Act, and did some research on the Youth

Offender Act, and for the record, I'll just put this there for the record, I would argue that the

Youth Offender Act conviction should not qualify."  (Id.).  Petitioner contends that "[c]learly, the

record supports [Petitioner's] argument that counsel's misadvice, based on not knowing or

interpreting the law correctly, led to [Petitioner] rejecting a favorable plea compared to the

unknowing mandatory life sentence he faced by exercising his right to a jury trial."  (Id. at 7-8).

Petitioner insists that he "would have definitely taken the plea offer had he known, through

counsel's advice, that a life sentence was mandatory if convicted at trial."  (Id. at 8).

    In response, Mr. Brown unequivocally rejects Petitioner's contentions, explaining that he

advised Petitioner that if he was convicted at trial, he would receive a sentence of life

imprisonment and that, because of this possibility, he "literally begged [Petitioner] to accept the [Government's] plea offer, which would have only proceeded on one 851 notice." (Doc. No. 15-1 at ¶ 1: Richard L. Brown Aff.). Mr. Brown has also attached to his affidavit a letter he sent to Petitioner on April 19, 2010, in which he advised Petitioner that "if [he is] found guilty (without any other agreement from the government) of the charges in the indictment, [he would] face mandatory life imprisonment" based on his prior felony drug convictions and 21 U.S.C. § 841. See (Id., Doc. No. 17-1 at 1 (emphasis added)). Mr. Brown has also attached to his affidavit an excerpt from the transcript from the hearing on Mr. Brown's motion to withdraw as counsel, dated July 28, 2010, nine days before Petitioner's trial began, in which Mr. Brown references the fact that Petitioner was facing a life sentence if convicted at trial, noting for the Court the importance of a strong attorney-client relationship because of the severity of the sentence faced by Petitioner. See (Id. at 2). Specifically, Mr. Brown stated to the Court at the hearing on the motion to withdraw:

> We [Petitioner and counsel] have a core philosophical difference that just is not allowing fruitful communications to come forth. And if I can't communicate with him back and forth, more so coming this way, than I cannot be an effective advocate. If this, Your Honor, were a case where we were looking at a 10-year case, you know, or maybe even a 20-year case, perhaps the severity of it would not be as bad. I want to take extra care with this, Your Honor, because this is a life sentence, no parole case. It's two 851s. And if I cannot get from him what I need to be effective—and your Honor, I will say, he's not been adversarial towards me. . . . . We've tried, but philosophically we are just different, in terms of certain things, and I don't—I don't think that I can be as effective as I have historically, and as I need to be, to give him the advocacy he needs on a life case. . . .. And I just—again--, I just want to be careful on this, because it is a –it's a very, very serious matter. I know that we hear the word, you know, life imprisonment, two 851s, all the time. But on the defense side of things, that life is real.

(Crim. Case No. 3:09-cr-189-RJC-DCK-3, Doc. No. 156 at 6-7) (emphases added)). Following Brown's statement at the motion to withdraw hearing, Government counsel put on the record the

fact that the Government's plea offer "of 20 years" remained open until the following day, which offer was based on the Government's offer to withdraw all but one of Petitioner's prior convictions noticed in the § 851 notice. (Id. at 16). In the Court's subsequent order denying counsel's motion to withdraw, the Court noted that "Mr. Brown suggests that, given the possible life sentence that Defendant faces if convicted, this poor communication interferes with his ability to mount an appropriate defense." (Id., Doc. No. 70: Order Denying Motion to Withdraw).

Petitioner has failed to show that counsel was ineffective with regard to his advice to Petitioner regarding Petitioner's likely sentence if he were convicted at trial, as the record clearly demonstrates that counsel Brown asserted and took the position, and Petitioner knew or should have known, that Petitioner was facing a possible mandatory life sentence if he were found guilty at trial. Although both Ms. Blake and Ms. Mobley assert that Mr. Brown assured them that Petitioner could not possibly receive a sentence of life sentence if convicted following a jury trial, the record of the hearing on Mr. Brown's motion to withdraw, just a week before trial started, makes clear that Mr. Brown took the position, in front of both Petitioner and the Court, that Petitioner would, indeed, be subject to a mandatory life sentence if he were convicted at trial. Petitioner was present during the hearing on Mr. Brown's motion to withdraw as counsel, and at no time did Petitioner object to Mr. Brown's assertion that Petitioner's was a "life" case, nor did Petitioner express confusion at the motion to withdraw hearing about the Government's plea offer of a mandatory minimum of 20 years, rather than life. Here, even assuming that, at some point in his representation of Petitioner, Mr. Brown expressed his belief to Petitioner, Ms. Blake, and Ms. Mobley that Petitioner would not face a life sentence if convicted at trial, the record makes clear that, on the eve of the trial, Mr. Brown believed and communicated to the

Court in Petitioner's presence, and while Petitioner could still accept a plea offer by the Government, that Petitioner was, indeed, facing a life sentence because of his prior convictions.[2] Although a court must "view[] the evidentiary proffers, where credible, and the record in the light most favorable to the petitioner," the court "need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." Puglisi v. United States, 586 F.3d 209, 214 (2d Cir. 2009). Here, Petitioner's assertion that counsel Brown told him he could not possibly receive a mandatory life sentence if convicted at trial is clearly contradicted by the record. In sum, Petitioner has failed to show that Mr. Brown misadvised him as to the sentence he would face if convicted at trial, and his first claim of ineffective assistance of counsel, therefore, fails.[3]

In sum, Petitioner's first ground for relief is without merit.

---

[2] The fact that Mr. Brown argued at Petitioner's sentencing hearing that the 1997 South Carolina conviction did not count as a prior conviction does not negate the fact that Mr. Brown took the position, in the presence of Petitioner just a week before trial, that Petitioner was, indeed, facing a life sentence based on two prior convictions, with one of them being the 1997 South Carolina conviction. Mr. Brown had a duty to advocate zealously for his client, and counsel was doing that at Petitioner's sentencing when he presented what he acknowledged was a weak argument. See (Crim. Case No. 3:09-cr-189-RJC-DCK-3, Doc. No. 157 at 6) ("I'll just put this there for the record, I would argue that the Youth Offender Act conviction should not qualify. Although I believe that it was—the South Carolina statute states that the punishment shall not exceed six years. And I understand that under Carachuri, I understand the standard. . . . And I'll put that out for appellate purposes, Your Honor. But I understand the standard [under Carachuri].").

[3] To the extent that Petitioner complains in his Reply that his first counsel Bender was also ineffective for, among other things, failing to inform Petitioner of the Section 851 notices against him before Bender was removed as counsel, this claim fails. Petitioner claims that if he had known about the Section 851 notices, he would have considered accepting a plea offer from the Government earlier in the case. See (Doc. No. 1-1 at 23-24). Petitioner has not shown, however, that any such plea offer had been made between Bender's appointment of counsel on December 7, 2009, and April 9, 2010, when the Court granted Bender's motion to withdraw as counsel. Furthermore, to the extent that Petitioner has cited alleged instances of ineffective assistance of counsel against Bender in Petitioner's affidavit attached to his petition, Bender withdrew as counsel well before Petitioner's trial, and Petitioner fails to show how he was prejudiced by any alleged deficient performance by Bender.

### 2. Counsel's Failure to Conduct an Adequate Investigation

In his second ground for relief, Petitioner contends that counsel Brown failed adequately to investigate the Government's case against Petitioner or potential witnesses who could exonerate Petitioner. In his affidavit, Brown states that he investigated each of the witnesses against Petitioner by familiarizing himself with their prior verbal and written statements and their criminal records, and he notes that he was able to cross-examine these witnesses at trial. (Doc. No. 15-1 at ¶ 2). Although Brown does not specifically respond to Petitioner's assertion that he should have investigated other potential witnesses, Petitioner does not explain what these witnesses would have said or how they could have exonerated him. Based on the evidence summarized above, the Government's case against Petitioner was overwhelming and included the testimony of at least two persons who engaged in prohibited drug transactions with Petitioner, and this evidence was corroborated by recorded telephone conversations. In light of Petitioner's failure to produce evidence, rather than mere assertions, that further investigation could have exonerated him, and in light of Mr. Brown's statement that he reviewed all discovery and prepared an adequate defense of Petitioner, Petitioner has not shown either deficient representation or prejudice.

In sum, Petitioner's second ground for relief is without merit.

### 3. Counsel's Failure to Object to Prosecutorial Misconduct

In his third ground for relief, Petitioner contends that Mr. Brown acted in collusion with federal agents and prosecuting attorneys by participating in a pretrial interview, during which Petitioner was unable to refute any of the Government's evidence. According to Petitioner, this interview "interfered with the attorney/client privilege and [Petitioner's] constitutional right to prepare a defense with counsel only." (Doc. No. 1-1 at 10: Pet. Mem. Supp. Mot. to Vacate). As

part of his claim related to prosecutorial misconduct, Petitioner asserts that a federal agent intimidated Courtney Blake and her father in order to prevent Blake from testifying as a witness on Petitioner's behalf. Mr. Brown responds to these assertions by stating unequivocally that he observed neither prosecutorial misconduct nor intimidation of witnesses, and he denies that there was any collusion. (Doc. No. 15-1 at ¶ 3). Brown states further in his affidavit that, while agents may have interviewed Blake, he had no knowledge or evidence that it was done in an intimidating manner and that he "neither allowed nor witnessed any intimidation of [Petitioner] during a pretrial meeting." (Id.). Brown notes that he offered Petitioner the opportunity to meet with Government counsel before his trial to listen to the evidence they had against him, and Brown has attached a letter in which he references that meeting. (Doc. No. 17-1 at 4).

Petitioner has also submitted an affidavit from Ms. Blake, in which she asserts that a federal agent threatened to take her parents' home and confiscate her father's SUV if she testified on Petitioner's behalf. (Doc. No. 5 at ¶ 14). Blake stated that this occurred after Petitioner notified Brown that Blake would testify on his behalf. (Id.). In response to Blake's assertions, the Government has presented an affidavit by Agent Bryant, in which Bryant describes his visit to Ms. Blake's father's home, explaining that he went to the residence to serve Ms. Blake with a subpoena. When Ms. Blake's father reported that Ms. Blake was not home and failed in his attempt to reach her by telephone, Agent Bryant left his business card and simply asked him to have Ms. Blake call her. (Doc. No. 15-2 at ¶ 10). Agent Bryant states in his affidavit that Ms. Blake's father was "cordial and helpful, as well as we were to him." (Id. at ¶ 11). Bryant denies that any threats were made toward Ms. Blake or her father, noting that he has never personally spoken to Ms. Blake; that he spoke to her father only on that one occasion; and that the agents did not leave the living room/kitchen area or look into the garage or in any other

room of the residence. (Id.). Agent Bryant also details the evidence the agents had of Petitioner's guilt and he asserts that Ms. Blake's willingness to testify had no bearing on the strength of the Government's evidence against Petitioner. See (Id. at ¶¶ 12-16). Consistent with Agent Bryant's assertion that he did not intimidate Ms. Blake, Mr. Brown's affidavit makes clear that he was not aware of any intimidation. Because Petitioner has not produced any evidence that Mr. Brown, in fact, colluded with Government counsel or any federal agent to intimidate a witness or deny him a fair trial, his claim fails.

In sum, Petitioner's third ground for relief is without merit.

### 4. Counsels' Stipulation to Prior Drug Convictions

In his fourth ground for relief, Petitioner claims that both of his trial counsels (Richard Brown and earlier counsel, Harold Bender) improperly agreed to the admission of a stipulation as to Petitioner's prior convictions that was unduly prejudicial and did not contemplate the balancing test required by Federal Rule of Evidence 403. The Government has attached as an exhibit a stipulation in which counsel Brown agreed to stipulate, on Petitioner's behalf, that Petitioner had previously been convicted of conspiracy to distribute and to possess with intent to distribute at least five kilograms of cocaine in the United States District Court for the District of South Carolina. (Doc. No. 17-1 at 6). In the stipulation Petitioner reserved his right to contest the admission of evidence of his prior conviction under Rule 403. (Id.). Mr. Brown explains that his decision to stipulate to this conviction was a strategy decision, and that in exchange the Government agreed not to present testimonial evidence of that prior conviction.[4] (Doc. No. 15-1

---

[4]  Indeed, as Mr. Brown notes in his affidavit, this strategy was actually listed in the footnote of the actual stipulation.

at 2).  Counsel's decision to stipulate to Petitioner's prior conviction, while reserving the right to object under Rule 403, was unquestionably sound, and Petitioner's claim of ineffective assistance of counsel on this basis fails.

In sum, Petitioner's fourth ground for relief is without merit.

### 5. Counsel Bender's Denial of Petitioner's Right to a Speedy Trial under the Speedy Trial Act

In his fifth ground for relief, Petitioner asserts that his first counsel, Mr. Bender, denied Petitioner the right to a speedy trial by working with prosecutors to delay his trial while he "languished in detention."  (Doc. No. 1-1 at ¶ 11: Pet. Aff.).  According to Petitioner, he had been detained for 123 days by the time Mr. Bender withdrew as counsel.  (Id.).  Petitioner's claim is without merit.  The Speedy Trial Act provides generally that "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days" from the filing of the indictment or the defendant's first appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  In computing the time within which a trial must occur, consistent with the Act, "[a]ny period of delay resulting from a continuance granted by any judge . . . at the request of the defendant or his counsel" is excluded, as long as the court finds that the ends of justice served by continuing the matter outweigh the best interest of the public and the defendant in a speedy trial.  Id. § 3161(h)(7)(A).  Additionally excluded is "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  Id. § 3161(h)(6).  Here, the record reflects that this Court granted two motions to continue filed by Silas Mobley's counsel before Mr. Bender withdrew as counsel on April 9, 2010.  See (Crim. Case No. 3:09-cr-189-RJC-DCK-3, Doc. Nos. 26; 39).  This Court

made the findings necessary to exclude these periods of time from the Speedy Trial Act, and Petitioner does not complain about any other periods of delay. Because there was no Speedy Trial Act violation or a Sixth Amendment speedy trial violation, Petitioner has not shown either deficient performance or prejudice as a result of any inaction on the part of Mr. Bender.

In sum, Petitioner's fifth ground for relief is without merit.

### 6. Counsel's Failure to Move for a Severance

In his sixth ground for relief, Petitioner asserts that trial counsel should have "procured a severance" for his trial from Silas Mobley's trial and the failure to do so deprived him of a fair trial. (Doc. No. 1-1 at 16). This claim fails. Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of . . . defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials . . . ." FED. R. CRIM. P. 14. However, the Supreme Court has recognized that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993). This is because "joint trials play a vital role in the federal criminal system and promote efficiency while avoiding the possibility of inconsistent verdicts." United States v. Allen, 491 F.3d 178, 189 (4th Cir. 2007). Thus, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. Joinder is specifically favored in conspiracy cases, United States v. Montgomery, 262 F.3d 233, 244 n.5 (4th Cir. 2001), and "[a] defendant seeking severance pursuant to Rule 14 'has the burden of demonstrating a strong showing of prejudice,'" United States v. Mir, 525 F.3d 351, 357 (4th Cir. 2008) (quoting United States v. Goldman, 750 F.2d 1221, 1225 (4th Cir. 1984)). It is not enough

that a defendant may have a better chance of acquittal in a separate trial or that his defense

"conflicts with or is antagonistic to a codefendant's defense." Allen, 491 F.3d at 189. Here,

Petitioner and his father were indicted together on conspiracy charges, and the evidence at trial,

credited by the jury, established that they conducted their drug business together, sometimes

conducting drug transactions together. Additionally, the evidence of Petitioner's guilt was

strong. In short, Petitioner cannot show that the joinder of his trial with his father's prevented

the jury from making a reliable judgment about guilt. Accordingly, trial counsel did not provide

deficient representation in declining to seek a severance, and because this Court properly would

have denied any such motion, he also cannot show prejudice.

In sum, Petitioner's sixth ground for relief is without merit.

### 7. Appellate counsel's failure to present stronger arguments

In his seventh ground for relief, Petitioner claims that appellate counsel "failed to bring

forth more favorable and meritorious arguments on direct appeal." (Doc. No. 1-1 at 17).

Although Petitioner mentions the arguments raised on appeal in his affidavit and suggests that

those could have been better presented, he identifies no meritorious argument that could have

resulted in the vacatur of this Court's judgment. Petitioner has not shown either deficient

representation or prejudice as a result of appellate counsel's representation.

In sum, Petitioner's seventh ground for relief is without merit.

### 8. Petitioner's Sixth Amendment Claim Based on Alleyne v. United States

In his eighth ground for relief, Petitioner argues that the Supreme Court's decision in

Alleyne v. United States, 133 S. Ct. 2151 (2013), requires this Court to vacate his sentence

because the fact of his prior convictions should have been determined by the jury beyond a

reasonable doubt. This claim fails. The Court in Alleyne held that any fact that increases a

mandatory minimum sentence for a crime is an essential element of the crime and must be submitted to the jury and proven beyond a reasonable doubt. (<u>Id.</u>). The Court in <u>Alleyne</u> declined, however, to disturb the exception to the general rule that facts that increase the prescribed range of penalties must be submitted to the jury and found by a reasonable doubt for the fact of a prior conviction, an exception first established in <u>Almendarez-Torres v. United States</u>, 523 U.S. 224 (1998). As Petitioner's claim falls squarely within the <u>Almendarez-Torres</u> exception, his Sixth Amendment claim under <u>Alleyne</u> is without merit. Moreover, courts addressing the issue have determined that <u>Alleyne</u> does not apply retroactively to cases on collateral review. <u>See, e.g.</u>, <u>United States v. Stewart</u>, 540 F. App'x 171 (4th Cir. 2013); <u>United States v. Redd</u>, 735 F.3d 88, 91-92 (2d Cir. 2013); <u>Simpson v. United States</u>, 721 F.3d 875, 876 (7th Cir. 2013); <u>In re Payne</u>, 733 F.3d 1027, 1029-30 (10th Cir. 2013). Finally, as the Government argues in its response brief, Petitioner's <u>Alleyne</u> claim is also procedurally barred because Petitioner failed to raise the claim on direct appeal, and he has failed to show cause or prejudice to excuse the default. <u>Alleyne</u> was decided after Petitioner's direct appeal. Although the Supreme Court has held that a claim that is so novel that its legal basis is not reasonably available to counsel may constitute cause for procedural default, <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998), an <u>Alleyne</u>-type argument is not sufficiently novel to show cause for procedural default. <u>See</u> <u>Bakhtiari v. United States</u>, No. 4:13cv1344, 2014 WL 988450, at *4 (E.D. Mo. Mar. 13, 2014).

In sum, Petitioner's eighth ground for relief is without merit.

## IV.     CONCLUSION

For the reasons stated herein, the Court will deny and dismiss the § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and

       **DISMISSED**.

2.      Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court

       declines to issue a certificate of appealability as Petitioner has not made a

       substantial showing of the denial of a constitutional right.  28 U.S.C. §

       2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to

       satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find

       the district court's assessment of the constitutional claims debatable or wrong).

Signed: December 7, 2015

Robert J. Conrad, Jr.
United States District Judge